943 A.2d 1192

**David TRAIL, et al.**

v.

**TERRAPIN RUN, LLC, et al.**

**No. 44, Sept. Term, 2007.**

Court of Appeals of Maryland.

March 11, 2008.

William C. Wantz, Hagerstown, for Petitioners.

Douglas F. Gansler, Atty. General, Charles J. Butler, Shelley Wasserman, Asst. Attys. General, Baltimore, brief of Maryland Dept. of Planning, Amicus Curiae.

Amy E. McDonnell, Jon A. Mueller, Annapolis, brief of The Chesapeake Bay Foundation, Inc., Amicus Curiae.

Lora A. Lucero, Chicago, IL, John C. Murphy, Baltimore, brief of American Planning Association and Maryland Chapter of APA, Amicus Curiae.

Robert S. Paye, Cumberland, for Respondents.

Gorman E. Getty, Cumberland, brief of The Board of County Commissioners of Garrett County, Amicus Curiae.

William M. Rudd, Cumberland, brief of The Board of County Commissioners of Allegany County, Amicus Curiae.

Argued Before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (retired, specially assigned), DALE R. CATHELL, (retired, specially assigned), JJ.

DALE R. CATHELL, Judge, retired, specially assigned.

With the inclusion of certain of the amici (via their briefs), this case, in one sense is a continuation of legislative battles that began in the early 1990s, where representatives of the environmental protection and professional land planning interests attempted to establish that the State, or State planners, should exercise greater control than theretofore enjoyed over most aspects of land use decision-making that then reposed in the local jurisdictions.[1]

---

**1.** The respondent also recognizes the conflict. It states in its brief that the situation if the petitioners' position were to be adopted "would create an unworkable, litigious system in which the Department [of State Planning] acts as a superior state Zoning Board reviewing each land use permit for compliance with its interpretation of broad and vague goals without a grant of statutory authority and without specific standards."

Because local zoning power emanates in the first instance from the State, it could be argued that the State can assume relatively complete control of land use matters throughout the State so long as constitution-

David Trail, et al., petitioners, presented only one question in their Petition for Certiorari:

"May a board of appeals deriving zoning authority under Article 66B grant a special exception, in the absence of an affirmative finding that the proposed use conforms to the jurisdiction's comprehensive plan?"[2]

We presume that petitioners are asserting that the administrative entity making the decision must mention the term "conform," because it now appears in the relevant section of the State statute, Article 66B,[3] and then explain its decision in relation to petitioners' (and some of the amici's) versions of the definition of the term "conform" as it relates to the local jurisdiction's plans.[4] We hold that the agency did that which

al protections are not violated. Even if it has such power, it has repeatedly chosen not to exercise the power and expressly has left most land use decisions to local control.

2. Petitioners and the various amici attempt in their briefs to expand the issues to be resolved beyond the single issue presented by the Petition. As we have said time and again, this generally will be ignored by us. Accordingly, we shall only directly resolve the question presented, although we may indirectly discuss some of the matters contained in the amici's briefs in our setting of the stage for the resolution of the pro per issue. *See Poku v. Friedman, et al.*, 403 Md. 47, 50, 939 A.2d 185, 186 (2008); *Levitt v. Fax.com, Inc.*, 383 Md. 141, 144, 857 A.2d 1089, 1091 (2004).

3. This is not a case where it is alleged that a local statute is not being applied as the local statute requires, but a case (according to the question in the Petition) where it is alleged that a State statute mandates that local governments when exercising local zoning powers must be in absolute and complete compliance with whatever master or comprehensive plans have been adopted by the local governments. It involves the effect of the language of the State enabling statute on the requirements for compliance at the local level-primarily with local plans, not compliance with state plans.

4. From our review of the record it appears that the local administrative entity in the present case may well have conformed its decision to the relevant requirements in any definitional sense argued by the parties. We have difficulty in understanding how a housing subdivision proposed by way of a special exception for an area designated in the master plan for urban development and which contains no areas delineated as "sensitive" in that master plan, generally, fails to "conform" to the master plan in a meaningful way. Because, however, the

the statute required it to do. We believe that the term "conform," standing alone, as first used by the Legislature in 1970, is the semantical equivalent of the phrase "in harmony with" which has long been the standard utilized in Maryland land use administrative practice.[5] We shall attempt later in our opinion to explain the history of the "local control/state control via mandates" issue from an examination of the legislative actions over the years.[6]

---

administrative agency based its decision on the right standard, and the certiorari question is limited, we do not need to resolve whether the agency's decision would have been correct under the standard proffered by the petitioners. We are, in essence, affirming the agency for the reasons it gave.

5. We recognize the assertion in the Court of Special Appeals' opinion in *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 655, 117 Md.App. 607, 701 A.2d 879, 902–03 (1997), that if the legislative body desires to create mandates of compliance it has the power to do so (so long as constitutional protections are not violated). We agree. That Court, as dicta, went on to suggest some examples of types of language that might achieve such a result. Again we agree that the use of language such as "conform" might be a part of the creation of mandates so long as it is surrounded by other language clearly indicating an intent on the part of the Legislature to establish mandates rather than guides. The Court of Special Appeals left the actual resolution of such issues to future cases.

Such additional language creating mandates is not present in the case *sub judice* and our examination of the legislative record in respect to the respective statutes, *infra,* indicates the contrary intent.

We also acknowledge our statement in *Mayor and Council of Rockville v. Rylyns Enterprises, Inc.,* 372 Md. 514, 530, 814 A.2d 469, 478 (2002) (citing *Richmarr,* 117 Md.App. at 635–51, 701 A.2d at 893–901), that:

"We repeatedly have noted that plans, which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statutes or local ordinances linking planning and zoning. Where the latter exist, however, they serve to elevate the status of comprehensive plans to the level of true regulatory device." (Footnote omitted.) (Underlining added.)

Petitioners argue that the term "conform" in Article 66B is just one of those "statutes." We disagree. Without more than is presented in the record of this case, the mere insertion of the word "conform," which first appeared in the Maryland statutes in 1970 (and has never since been defined as creating mandatory absolute compliance), does not, by itself, create mandates.

6. The parties and amici have included their versions of the legislative

## Facts

The site at issue is located in the A and C zones in Allegany County. In those zones planned unit developments, such as that in the case at bar, are permitted as special exceptions to the provisions of the zoning code. The site had been expressly designated for urban development as far back as 1995 and that designation continued through the 2002 version of the County Comprehensive Plan. The site was not included under the County's master plans as a "sensitive area." There is nothing we have found in the record of this case indicating that the Maryland Department of State Planning prior to this action ever objected to the inclusion of this site as suitable for urban development in the County's Master Plans.

Prior to the application at issue here, the Allegany Planning Commission had visited the site and determined that the proposed development then contemplated, that later was the subject of the application and of the grant of the special exception at issue, was consistent with the Comprehensive Plan.

In August 2005, Terrapin Run, LLC ("respondent") applied to the Board of Appeals of Allegany County (the "Board") for a special exception provided for in the local zoning code to establish a planned residential development (the "development"). The development was to be located on 935 acres of

history (in some cases taking statements out of context). While we have read and considered the parties' positions on that history, we shall not rely on their allegations as to the legislative history. We have conducted our own research. Our failure to attribute, or to specifically discuss a particular party's version of legislative history (or any other issue for that matter) should not be construed as a failure to consider it. Everything in the parties' briefs was considered and internally addressed within the Court, albeit many matters may not be expressly discussed in our opinion because we deem it necessary in this opinion only to discuss the determinative issues. We are not required to, nor do we choose to, create from the briefs of the various parties or amici a "bullet" list of positions and issues in order to specifically accept or reject in writing each matter presented as an "issue." We deal with the limited question in the certiorari petition. Our limitation should not be construed as any indication that we agree (or perhaps disagree) with any position in respect to any issue we choose not to expressly discuss in this opinion.

land, primarily zoned as District "A" (Agricultural, Forestry and Mining), with a portion of the tract located in District "C" (Conservation). The 935–acre tract of land abuts Route 40 and Shipley Road on the east side, and Green Ridge Road on the west. Green Ridge State Forest is located to the east of the tract, and there are also forested lands south of the tract.[7] The development would consist of 4,300 residential units, an equestrian center, a community building and a 125,000 square foot shopping center. Additionally, the development would require a sewage treatment plant, to be located along Route 40. The Board noted that the project would take twenty years to complete and during that time, 150 to 200 separate permits and approvals would be required for its completion.

As relevant to the case at bar, after eight sessions in which the Board heard from 11 experts (nine for the applicants and two for the protestants), and received more than 80 exhibits, the Board, in a lengthy finding of facts, found that the proposed development would be in harmony with the Allegany County Comprehensive Plan, 2002 Update (the "Plan"). The Board opined that the Plan was advisory in nature, rather than regulatory, and that strict conformance with the plan was not required. Included in its findings were the following "conclusions," as stated in Respondent's brief to the Court of Special Appeals: [8]

"● There is a specific statement in the Allegany County Plan stating that it is the function of the Plan to serve as a guide;

● It is commonly understood that Master Plans are guides in the development process, which guidelines are mandatory only if an Ordinance so provides;

---

7. We are informed that at one time substantial areas of the tract at issue had been forested. In the years just prior to the present application the area had been "timbered," i.e., the timber (the trees) were cut down. In other words, large portions of the area's timber had been "harvested." Presumably, those areas are now "scrub" areas, i.e., the condition that remains after timber is commercially harvested.

8. While petitioners challenge the correctness of the Board's findings, they do not challenge Respondent's assertion that these were among the Board's findings.

- The Allegany County Ordinance contains no requirement of strict adherence to the Plan and affords it no regulatory authority;

. . .

- That conformity to the Plan is not required; and
- That the proper issue to be decided by the Zoning Board is 'whether the use in the particular case is in harmony with the general purpose and intent of the Plan'." (Internal citations omitted.)

Consistent with Article 66B's requirement that if some jurisdiction desires to exercise zoning power, it must first develop a Master or other Comprehensive Plan, Allegany County, as we have indicated, had adopted such a Plan. Included in that Plan at the relevant time were the "vision" statements which were required to be included. Additionally, the Plan included a sensitive areas compilation as required by Article 66B. As previously indicated, the subject site was not included as a sensitive area in the Comprehensive Plan and was indicated for future Urban Development.[9] The Plan describes that its purpose or intent is as a "guide" in respect to the issue of land use. The Maryland Department of Planning[10] was privy to the County's actions in adopting its Master Plan and there is nothing in the record before us to which our attention has been directed indicating that the Department made any objection at the time in respect to the inclusion of the subject site as an area for urban development.

The request for a special exception was eventually approved by the Board using the traditional "in harmony with" stan-

---

**9.** Steep slope areas comprise over 50% of the land area of the County. In an additional 30% of the land area of the County containing stream valleys, development is restricted. Only 10% of the County's land area was considered suitable for urban development. The site at issue is part of the 10% considered suitable for urban development.

**10.** During our discussion, *infra*, we make numerous references to the "Office of State Planning." Sometime during the period subsequent to 1970, the "Office of State Planning" became the "Department of State Planning." As used here, the terms are interchangeable.

dard.  Petitioners objected to the "in harmony" standard set forth by the Board of Appeals, and appealed to the Circuit Court for Allegany County.  They contended that the Board erred as a matter of law in granting a special exception where there was no finding that the proposed use "conformed" to the Plan.  At the Circuit Court, petitioners primarily relied on the definition of a special exception as set forth in the Maryland Code (1957, 2003 Repl.Vol.), Article 66, § 1(k), which now states:

> " 'Special exception' means a grant of a specific use that would not be appropriate generally or without restriction and shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, that the use conforms to the plan and is compatible with the existing neighborhood."

Petitioners relied on the definition of "Plan" as set forth in Article 66, § 1(h), which states:

> "(1) 'Plan' means the policies, statements, goals, and interrelated plans for private and public land use, transportation, and community facilities documented in texts and maps which constitute the guide for the area's future development.
>
> "(2) 'Plan' includes a general plan, master plan, comprehensive plan, or community plan...."

On May 5, 2006, the Circuit Court issued a judgment and opinion remanding the case to the Board with directions that it determine whether the proposed use was "consistent with" the policies and recommendations of the Plan.  In arriving at that standard, it referred to the Allegany County Zoning Ordinance, which at one point had stated as part of its legislative purpose: "[T]o ensure that these uses are *consistent with* the policies and recommendations of the Allegany County Comprehensive Plan...." (Emphasis added.)

Petitioners appealed the decision of the Circuit Court to the Court of Special Appeals, asserting that the proper standard is conformance, rather than harmony (or consistency).  Respondents cross-appealed, arguing that the standard

of harmony set forth by the Board was correct, and that the Board's decision should be affirmed for the reasons it had given.  The Court of Special Appeals filed its decision on April 6, 2007, reversing the judgment of the Circuit Court, and affirming the decision of the Board.  Relying in part on *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981),[11] and *Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md. App. 607, 701 A.2d 879 (1997).  Judge Eyler, James R., in an excellent opinion for that Court, held in relevant part:

"It is beyond question that different words or phrases may connote different meanings.  On the other hand, words have synonyms, and they must be viewed in context to determine if the choice of a particular word or phrase, as compared to a similar word or phrase, represents a semantical difference or a substantive difference.

"Article 66B is a general enabling statute and, by its express terms, rests land planning and land use controls with local jurisdictions.  The 'Plan' is referred to several times in Art. 66B as being merely a guide.  The definition of 'Plan' in Art. 66B, section 1.00(h)(1), states: " 'Plan' " means the policies, statements, goals, and interrelated plans ... which *constitute the guide* for the area's future development. . . .  Art. 66B, section 3.05(a)(2)(i), discussing the pow-

---

**11.**  "This Court has frequently expressed the applicable standards for judicial review of the grant or denial of a special exception use.  The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid.  The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption*.  The duties given to the Board are to judge whether the *neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

"But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal." (Italics in original.)  (Underlining added.)

*Schultz*, 291 Md. at 11, 432 A.2d at 1325.

ers and duties of the local planning commission, states that the plan shall 'Serve as a guide to public and private actions and decisions to ensure the development of public and private property in appropriate relationships.' ... Article 66B, section 3.05(a)(4)(i) states that the plan shall contain a 'statement of goals and objectives, principles, policies, and standards, which shall serve as a guide for the development and economic and social well-being of the local jurisdiction.'

"Additionally, the terms that appellants allege have different meanings, requiring different levels of accord, are used interchangeably in Art. 66B without any discernible intended difference."

. . .

"In *Schultz v. Pritts*,[12] Judge Rita Davidson, writing for the majority, stated the required finding as follows:

'The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating that presumption. The duties of the Board are to judge ... *whether the use in the particular case is in harmony with the general purpose and intent of the plan.*'

[*Schultz v. Pritts*, 291 Md.] at 11, 432 A.2d [at 1325] (emphasis added).

"The Court of Appeals was clearly aware of the definition of special exception contained in section 1.00(k), as that provision was reproduced in its entirety in the Court's opinion.... The Court's inclusion of the statutory definition of special exception, coupled with the language that the proposed use must be in 'harmony with the general purpose and intent of the plan,' necessarily means that the Court was of the view that the different words conveyed essential-

---

**12.** 291 Md. 1, 11, 432 A.2d 1319, 1325 (1981). *Schultz* was decided eleven years after the 1970 statute in which the word "conform" first appears, as we discuss, *infra*.

ly the same meaning. That meaning, under Article 66B, is that special exception use does not have to strictly comply with a plan. It is up to the local jurisdiction, if it so chooses, to make it so.

. . .

"In our view, nothing within the zoning code or the comprehensive plan itself acts to elevate the plan beyond a mere guide. Whether we describe the Board's analysis as examining whether the special exception use is in harmony with, consistent with, or in conformity with the plan, the terms differ only semantic ally. In the present case, each term connotes only a general compatibility with the purpose and intent of the plan, as opposed to a strict adherence of the plan."

*Trail v. Terrapin Run, LLC,* 174 Md.App. 43, 50–57, 920 A.2d 597, 601–05 (2007).[13] We agree with the reasoning of the Court of Special Appeals.

■ Before we address the legislative history of the relevant statutes, we point out once again that in Maryland, with some possible exceptions, local governments generally are not required to adopt zoning ordinances, master plans, comprehensive zoning plans, and the like.

What is sometimes forgotten in the battles in the land use arena is that Article 66B was never intended to mandate that local governments adopt zoning. What it did was to empower them to do so, if they chose to do so, and if they so choose, Article 66B imposed suggestions, guides, and, in some instances, restrictions on how it was to be done. Its general permissive character was, and is, recognition that in adopting Article 66B the State was permitting local governments to interfere with a property owners constitutional and common-law rights to use his/her property in any manner (so long as a common-law nuisance is not created by the unrestricted use).

---

**13.** We granted certiorari at *Trail v. Terrapin Run,* 400 Md. 647, 929 A.2d 890 (2007).

The Legislature's intent in enacting general zoning legislation was not to mandate that local governments adopt zoning, it was merely empowering them to do so. It, in essence, stated: "If you want to do it, here is how you can tell property owners how their property may, and how it may not, be used." Its general intent was not to require, but to permit.

Accordingly, when it is argued that a provision was intended to be mandated, that provision must be examined in light of the general permissive aspect of Article 66B and not some perceived mandatory aspect. Thus, while the State might be able, so long as the language is sufficiently specific, to create mandated requirements, an intent to create compliance absolutism is not presumed—it must be proven from specific language and/or the intent of the Legislature in enacting statutes.

We are also cognizant of the general rule relating to the interplay between zoning issues (as opposed to subdivision issues) and Master Plans. The appellate courts of this State have repeatedly noted that, generally, Master Plans, Comprehensive Plans, and the like, are advisory, guides only, and not normally mandatory insofar as rezonings, special exceptions, conditional uses and the like are concerned.

Seventeen years after the 1970 statute that first inserted the word "conform" in a definitional section that defined "special exception," this Court, in *West Montgomery County Citizens Ass'n v. Maryland–Nat'l Capital Park and Planning Comm'n,* 309 Md. 183, 186–96, 522 A.2d 1328, 1329–34 (1987), opined:

> "A county enjoys no inherent power to zone or rezone, and may exercise zoning power only to the extent and in the manner directed by the State Legislature. . . .
>
> "In October, 1980, the Functional Master Plan for the Preservation of Agriculture and Rural Open Space in Montgomery County . . . was approved and adopted. . . .

. . .

"Similarly, in *Mont[gomery] Co[unty] v. Woodward & Lothrop*, 280 Md. 686, 704, 376 A.2d 483[, 493] (1977).... Chief Judge Murphy said for the Court that land use planning documents such as General or Master plans

'represent only a basic scheme generally outlining planning and zoning objectives in an extensive area, and are in no sense a final plan; they are continually subject to modification in the light of actual land use development and serve as a guide rather than a strait jacket.'

That remains the general rule.

More important even, in analyzing land use issues that impact upon the fundamental constitutional rights of property owners, it is appropriate to start with a position stated by this Court long ago (and still relevant) in *Landay v. Zoning Appeals Board*, 173 Md. 460, 465–66, 196 A. 293, 295–96 (1938):

"In a constitutional sense, the only justification for the restrictions imposed by such[zoning] laws as the ordinance under consideration on the use of private property is the protection of the public health, safety, or morals....

"Such ordinances are in derogation of the common law right to so use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, they should not be extended by implication to cases not clearly within the scope of the purpose and intent manifest in their language." (Citations omitted.)

And see *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 313, 289 A.2d 303, 308 (1972), where we stated further:

"[W]e are mindful of the fact that 'the constitutionality and validity of zoning laws depend essentially upon a reasonable balancing of public interest in zoning as against opposing private interests in property'.... In such a situation we must not forget the underlying principle that, 'such ordinances [zoning ordinances] are in derogation of the common

law right to use private property as to realize its highest utility, ... they should not be extended by implication. ...'" (Citations omitted.)

See also *White v. North,* 356 Md. 31, 48, 736 A.2d 1072, 1082 (1999), where after reaffirming the *Landay* statement above, we additionally said:

"In *Landay* [ ], we noted that '[i]n a constitutional sense, the only justification for the restrictions ... on the use of private property is the protection of the public health, safety, or morals.'... *See also Gino's of Maryland, Inc. v. Mayor of Baltimore,* 250 Md. 621, 642, 244 A.2d 218, 230 (1968) ('[Z]oning ordinances are in derogation of the common law and should be strictly construed.'); *County Comm'rs v. Zent,* 86 Md.App. 745, 751, 587 A.2d 1205, 1208 (1991); *Lone v. Montgomery County,* 85 Md.App. 477, 494–95, 584 A.2d 142, 150–51 (1991)."

*See also Stansbury v. Jones,* 372 Md. 172, 187, 812 A.2d 312, 321 (2002) (quoting *Landay,* 173 Md. at 466, 196 A. at 296).

We now examine the relevant statutes.

### A.   The 1970 Legislation

Prior to the 1970 legislation (and at least since 1957), the Maryland Code, Art. 66B, § 7. **Board of zoning appeals.,** (the then general section outlining the powers of boards of appeals) had provided in relevant part that "said board of zoning appeals may ... make special exceptions to the terms of the ordinance *in harmony with its general purpose* and in accordance with general or specific rules therein contained." (Emphasis added.)

In the late 1960s, a *Final Report* of the Maryland Planning and Zoning Law Study Commission, dated December 1969, was issued in support of proposed 1970 legislation.[14]  The 1970

---

14.  The legislative records of the relevant bills were not preserved, or if preserved, we have been unable to access the records.  The only document in respect to that 1970 recodification statute that we have found is the *Final Report* upon which the subsequent statute was apparently partly based.  Nonetheless, the *Final Report* contains rele-

statute that resulted changed the relevant language relating to special exceptions by the insertion of a general definition clause [15] in the new Article 66B. As relevant to the case at bar, it read as follows:

" § 1.00.   **Definitions.**

. . .

" *'Special exception'* means a grant of a specific use that would not be appropriate generally or without restriction and shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, <u>that the use conforms to the plan</u> and is compatible with the existing neighborhood."   (Underlining added.)

The use of the word conform, or its derivatives, appears to date from this 1970 statute.   The question then becomes— "Why did the Legislature change the relevant language in 1970?"   As we have noted, we have been unable to access any bill files from that 1970 era in respect to the statute at issue. We have, however, found the report (the *"Final Report"* *supra*) that provided the impetus for the re-codification of Article 66B which resulted from the passage of Chapter 672 of the Laws of 1970.   That report, fully titled as "LEGISLATIVE RECOMMENDATIONS-FINAL REPORT, (Dec.1969)," was prepared by the Maryland Planning and Zoning Law Study Commission that was Chaired by the Honorable Goodloe E. Byron of Frederick, Maryland, and included members from all geographical regions of the State.   Upon our reading of *the Final Report* and its appendices, notes and commentary, we find no indication that the State, by its use in the statute of the word "conform," intended to force on local governments an absolute requirement for complete compliance with their respective local master and other comprehensive plans.

vant information on what ultimately became Chapter 672 of the Laws of 1970, subsequently codified as MD Code, Article 66B, § 7(a).

**15.**   There was no definition clause in the pre–1970 statute.

In a Note relating to the Commission's proposal for the inclusion of the definition section, the report stated:

" '*Special Exception*'—*This term was not defined informer Article 66B. The definition has been extracted from Montgomery County v. Merlands Club, 202 Md. 279, [288,] 96 A.2d 261, [264–65] (1953), where the court drew a clear distinction between this term and a 'variance.' In addition, the more recent opinion by Barnes, J. in Cadem v. Nanna, 243 Md. 536, [543,] 221 A.2d 703[, 707] (1966)[,] provided guidelines in regard to this power.*

"*This definition effects a change in the case law of Baltimore City. In the past, there has been no distinction in Baltimore City between the terms 'variance' and 'special exception' since both could be granted if there were 'practical difficulties or unnecessary hardship.'...*" (Citation omitted.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGISLATIVE RECOMMENDATIONS–FINAL REPORT, at 18 (Dec.1969).

While the reference in respect to *Merlands Club* in the Note primarily dealt with attempting to create a distinction in Baltimore City between "variances" and "special exceptions," the *Merlands Club* case was one which involved the then standards in Montgomery County for the granting of a special exception. The Montgomery County administrative entity had repeatedly in the case declined to use the "in harmony with" standard of the applicable County statute. We opined in that case, as relevant here, that:

"What Section 13 g [the section creating the 'in harmony with' standard] does is to delegate to the Zoning Board a limited authority to permit enumerated uses which the legislative body finds in effect *prima facie* properly residential, absent any fact or circumstance in a particular case which would change this presumptive finding. The duties given the Board are to judge whether the neighboring properties and the general neighborhood would be adversely affected, and whether the use, in the particular case, *is in*

*harmony with the general purpose and intent of the zoning plan . . . .*

. . .

"Under the legislative enumeration of Section 13 g, private clubs are *prima facie* to be permitted in a residential use area. The applicant for such a use need not show either practical difficulties, un-necessary hardship, or great urgency, but only that the club is a private club and that it would be in general harmony with the zoning plan and would not adversely affect the neighboring properties and the general neighborhood." (Emphasis added.)

*Merlands Club,* 202 Md. at 287–90, 96 A.2d at 264–65.

It is clear from the language in *Merlands Club* and in this Note to the *Final Report* that the inclusion of a definition section had nothing to do with an attempt by the Legislature to impose mandatory requirements or some standard beyond the previously accepted "in harmony with" standard. It was primarily to create for the first time a definition and to create a distinction in Baltimore City between "special exceptions" and "variances." [16]

The *Cadem* case involved a private contract. It had relatively little relevance to the matter for which it was cited. It merely noted as dicta that special exceptions and zoning reclassifications were vastly different zoning matters, traditionally governed by different standards.

In a Note addressing the recommendation in respect to the inclusion of proposed Section 4.07(d) (which re-codified the pre–1970 Section 22) the *Final Report* noted: "*Section (e) through (g) [formerly Sections (d), (e),(g)[17] and (f) respectively] have not been changed, but have only been moved to a*

---

**16.** It can be argued that the attempt to create that distinction in Baltimore City failed.

**17.** Prior sub-section (g)(2) contained the authorization for boards of appeal to consider and grant or deny special exceptions. The language remained basically unchanged in the 1970 statute.

*more logical place within Section 4.07. There has been no substantive change in any of these subsections "* MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGISLATIVE RECOMMENDATIONS–FINAL REPORT, at 32 (Dec.1969) (brackets in original).

The proposed Purposes clause of the recommendations of *the Final Report,* and the statute as enacted in 1970, both contained clauses stating that plans adopted pursuant to the statute's authority were to be guides to land use, not absolute requirements. At one point, on page 74, the *Final Report* proposed that the Purposes clause of the proposed statute contain the statement:

> "The powers granted here in shall be exercised with fore-thought and reasonable restraint so that the measures adopted will promote the economic prosperity of this State, secure continued improvement in the living conditions for all segments of the population and offer the maximum encouragement to private initiative for the accomplishment of these goals."

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGISLATIVE RECOMMENDATIONS–FINAL REPORT, at 74 (Dec.1969). Nowhere, in the proposed plan or the statute was it stated that the provisions in master plans were to be mandates. Section **"3.06 Purposes in View,"** provided, as relevant here, "The plan shall be made with the *general* purpose of *guiding and accomplishing* the coordinated, adjusted, and *harmonious* development of the jurisdiction...." MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGISLATIVE RECOMMENDATIONS–FINAL REPORT, at 25 (Dec.1969) (emphasis added).

Ultimately, the Commission recommended that a "Model Land Development Code," *Id.* at 11, be adopted, and attached a copy of what it was proposing, drafted by Professor Jan Krasnowiecki of the University of Pennsylvania Law School, now retired. In attaching a copy of the document as Appendix C to the *Final Report,* the Commission also included its comments and notes, some of which are of interest in respect to the Commission's intentions and purposes as to the changes

being proposed.   In those Notes at page 59 of the *Final Report,* the Commission stated, in relevant part:

> *"Indeed, the definition of 'development' is only one element of the boundary—the outer limits imposed by this Code on the exercise of the powers.   Other elements of the boundary are that the local government must adopt regulations, that it must follow certain prescribed procedures. These are minor elements by comparison to the overriding elements which are (a) that the local government cannot go beyond the stated purposes of the Code (Section 201); and (b) that it cannot go beyond the limits imposed by the Constitution of this State or of the United States.   Within the boundaries imposed by these elements, the local government is authorized to control the subject matter defined as 'development' and 'land use,' but it is not* required to do so. Furthermore, if it decides to control some of the subject matter, *it is not required to use the same words.*   In that sense, the definitions in the Code are internal to the Code. With this understanding, we now turn to the individual definitions.

. . .

> " 'Local government.'   *Section 201(1) vests the power to regulate 'land use' and 'development' in 'every local government.'   Obviously, the definition of 'local government' is critical, since it will determine the applicability of the Code. Because this is a highly sensitive political decision, it was felt best to discuss the various alternatives in this comment. There are, basically, two approaches.*
>
> *"Mandatory Applicability.   An attempt to make the Code applicable to certain described local governments on a mandatory basis presents grave difficulties because of the crazy-quilt pattern now prevailing in the laws from which local governments draw their zoning and planning powers*
. . . .

. . .

> *"Optional Applicability.   Any lingering constitutional problem and the incipient political problems would disap-*

*pear if the applicability of the Code were left to local option. All hope of uniformity might likewise evaporate* . . . ." (Underlining added.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-LATIVE RECOMMENDATIONS–FINAL REPORT, at 59–67 (Dec.1969). The version ultimately adopted for recodification by the Legislature, for the most part, was that of Optional Applicability.

The Commission at page 71 also noted that:

*"But there are clearly two ways in which a map or plan can restrict development, the continuation of a land use. The zoning map, for example, restricts development because it serves to locate the land to which the text of the zoning ordinance applies. . . . Similarly, a plan (or plat) adopted pursuant to Section 31, Article 66B, has the effect through the intermediacy of the statute itself . . . of prohibiting buildings in the bed of the planned street. The same, however, is not true of a 'master plan' adopted pursuant to Section 15–18 of Article 66B. If a master plan marks the owner's property as a 'proposed park,' there is no prohibition against building so long as the zoning permits it. If the zoning ordinance prohibits it, the owner can complain that he is unreasonably restricted by the zoning. . . . Otherwise, the master plan is only a guide to future public action (i.e., future acquisition or condemnation), an announcement of intent."* (Underlining added.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-LATIVE RECOMMENDATIONS–FINAL REPORT, at 71 (Dec.1969).

The Commission included in its Notes a discussion of the nature of master plans, i.e., comprehensive plans, and the pros and cons of making compliance with such plans mandatory, noting at page 107:

*"Consequently, local governments have found that it is impossible to secure a proper pattern of land use and development by making general and impartial rules—particularly if these rules must be so detailed as to leave nothing to administrative discretion. . . . It is as if the legislature were being asked to sit down one day and*

describe with infinite particularity an end state for the community by establishing rules which would cause all land use and development in the future to march towards that end with unerring aim. *Plainly the 'end state' concept of land use control is bankrupt and it has been in this condition from the beginning. The* [proposed] *Code abandons this view of land use control completely by giving significance to the administrative function on the local level and by otherwise preserving complete neutrality on the issue whether land use and development should be controlled by detailed legislative rules or by general legislative standards to be implemented by an administrative agency* .... Indeed, where the flexible administrative approach is used, the rules and standards established to *guide* the administrative agency may themselves be in need of occasional change.

"The General Assembly has the power to require that the local government state standards for itself and it is arguable that it has done so. That is the argument about the phrase 'in accordance with a comprehensive plan.'

"The difficulty with the 'comprehensive plan' requirement is this: either the comprehensive plan is something that the local legislative body adopts for itself, or it is something that is adopted by others and imposed on the local government—as, for example, by a regional agency or by the courts. If it is the former, then one must face squarely the question: when a local government amends a zoning ordinance in a way which appears to be in conflict with the comprehensive plan, why is not the amendment of the ordinance a pro tanto amendment of the plan? ...

"[W]here the amendment does not involve a public improvement, how do the courts come to the conclusion that the amendment is in conflict with 'the comprehensive plan' rather than to the conclusion that the amendment is a pro tanto amendment of the plan? ...

"If there is agreement that these narrow concepts have done more to hamper than to aid the proper planning and development of a community, what should be substituted in

*their stead? The answer which has been urged over the past decade is to require that the local government adopt a 'comprehensive plan.' But that only brings us back to the point of beginning. Should this plan be a 'physical' plan, disposing of all future development in minute detail? Should it be a 'policies 'plan, the detail to be filled in as the community moves along. Or should it be something in between? The dilemma, of course, is that the less detailed and 'physical' is the plan, the less decisive it is in any particular zoning controversy. . . . "*

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-LATIVE RECOMMENDATIONS–FINAL REPORT, at 107–08 (Dec.1969).

At page 109 the *Final Report* noted:

*"Aside from having the effect of requiring that the legislative body consult with its planning agency and of discouraging, as a practical matter, actions which would take the legislative body on a frolic of its own, what is the function of the plan itself? . . . But a plan can be a commitment that may be as foolish as it may be wise and men do not distinguish well between wisdom and folly when it comes to admitting a mistake."* (Underlining added.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-LATIVE RECOMMENDATIONS–FINAL REPORT, at 109 (Dec.1969).

At another point, Section **"201. Grant of Power: Purposes"** in the Model Plan attached to the *Final Report*, the text included:

"(1) . . . The powers granted herein shall be exercised with forethought and reasonable restraint so that the measures adopted will promote the economic prosperity of this State, secure continued improvement in the living conditions for all segments of the population and offer the maximum encouragement to private initiative for the accomplishment of these goals." (Underlining added.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-LATIVE RECOMMENDATIONS–FINAL REPORT, at 74 (Dec.1969). The Commission's Note to this section states:

*"In addition, Subsection (1) reaffirms the salutary princi-
ple that 'maximum encouragement' should be given to
'private initiative' for the accomplishment of these goals.*

*"Finally, Subsection (1) demands that in all of these
matters the local government shall proceed 'with fore-
thought and reasonable restraint.' The word forethought
lends special emphasis to the 'ongoing planning' require-
ment of Section 303 and this word together with the specific
provisions of Section 303, replaces the words 'in accordance
with a comprehensive plan.' "*

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-
LATIVE RECOMMENDATIONS–FINAL REPORT, at 75 (Dec.1969).

In another discussion in reference to the proposed Model
Plan, beginning on page 77 of the *Final Report,* the Commis-
sion noted:

*"The* [proposed] *Code does not attempt to prescribe the
degree of specificity a rule or standard must attain in order
to qualify as a sufficient 'guide.' In their concern to
prevent unbridled administrative discretion, courts have
long recognized that the degree of specificity must vary
with the nature of the subject matter. There is no such
thing as an invariable measure of specificity. The most
that can be said is that the standards must go as far as
delineating the bounds of administrative discretion as is
possible, as the practicalities of the situation allow, taking
into account the nature of the subject matter and the public
interests to be served by the controls that are devised.
Accordingly, the precise level of specificity must be left to
the sound judgment of the local government and, ultimately
the courts."* (Underlining added.)

MARYLAND PLANNING AND ZONING LAW STUDY COMMISSION, LEGIS-
LATIVE RECOMMENDATIONS–FINAL REPORT, at 77–78 (Dec.1969).

This note (especially the underlined portions) submitted to
the Legislature at the time of the enactment of the 1970
statute and evidentially available to its members, would seem
to contradict any proposition that by including, for the first
time, a definition of the term "special exception," which con-

tained the word "conform," the Commission was proposing that the Legislature attempt to impose a mandatory State requirement for absolute compliance by local governments with every part of their local master or other comprehensive plans.[18] This passage, which includes a reference to a "guide" standard, seems to belie any argument that the Commission in 1969 was suggesting to the Legislature that requirements should be imposed by the State statute (Article 66B) that would require local governments to insist that applicants for special exceptions (or even applicants for certain other approvals) be held to a strict and absolute requirement with every element of the "guide" plans—the local government master plans.

In summary, the *Final Report* of the Commission that recommended to the Legislature that it define the term "special exception" in Article 66B with language that included the word "conform," was not recommending that by inserting the definitional language in the Code, it was proposing that the State mandate that local governments require absolute compliance with local master plans when considering special exceptions (and other zoning changes). The contrary appears to be the case.

Moreover, a glance at dictionary definitions of the time indicate that the term "conform" was generally considered to be the equivalent of the phrase "in harmony with."[19]  *The Random House Dictionary of the English Language* 308 (1983), contains this definition of "conform:"

"con•form (kənfôrm), *v.i.* 1. to act in accord or harmony; comply (usually fol. by *to* ): *Being obstinate, she refused to*

---

**18.** This Court has never before held that the insertion of the definitional section was meant to change the traditional standards in respect to the granting of special exceptions. We will discuss our cases that were rendered just before the enactment of the 1970 statute and those rendered just after its enactment, and some of those rendered later in time, *infra.*

**19.** We do not attempt to include all permutations within these dictionary definitions, only those directly relating to the proposition that "conform" and "in harmony" are consistent terms.

*conform to the town's social pattern.* **2.** to be or become similar in form, nature, or character. **3.** to comply with the usages of an established church ... *v.t.* **4.** to make similar in form, nature, or character. **5.** to bring into agreement, correspondence, or harmony." (Underlining added.)

*Webster's Third New International Dictionary* 477 (3rd ed.1961), definition includes the following language:

"**conform** ... ADAPT ... bring into harmony or agreement ... this regulation to existing business practices ... **1:** to have the same shape, outline, or contour ... be in agreement or harmony ... **2a:** to be obedient ... act in accordance with prevailing standard or custom. . . ."

We fail to see any sufficient indication or support in the abbreviated legislative history surrounding the passage of the 1970 recodification legislation, in the general permissive character of Article 66B (that does not require zoning in the first instance), or in the dictionary definitions prevalent at the time, that the Legislature was attempting to change the longstanding court recognized standard of "in harmony with" to some type of mandatory imposition of absolutism in the consideration by local governments of the relationship between "special exceptions" (and other land use devices) and local master or comprehensive plans or other local land use ordinances or regulatory devices. There is no sufficient evidence that the General Assembly was attempting to change long accepted legal standards in "special exception" practice.

■ Moreover, we generally do not construe recodifications as creating substantive changes in the absence of specific indications otherwise. We recently reiterated in *Marzullo v. Kahl,* 366 Md. 158, 189–90, 783 A.2d 169, 187 (2001), that:

"Furthermore, we have held that a change in a statute as part of a recodification will not modify the law unless the intent of the legislative body to change the law is clear. In *Blevins & Wills v. Baltimore County,* 352 Md. 620, 642, 724 A.2d 22, 32–33 (1999), we stated that:

'We have long recognized and applied the principle that "a change in a statute as part of a general recodification

will ordinarily not be deemed to modify the law *unless the change is such that the intention of the Legislature to modify the law is unmistakable* " That is because the principal function of code revision "is to reorganize the statutes and state them in simpler form" and thus "changes are presumed to be for the purpose of clarity rather than for a change in meaning." ' " (Emphasis in *Marzullo*.) (Some citations omitted.)

Neither have we been directed to any holding of this Court since 1970, and we know of none, where we have held that the use of the word "conform" in the 1970 statute created an absolute requirement in Article 66B that in order for special exceptions to be granted they must be in full and complete compliance with every aspect of the various types of land use plans and ordinances adopted by the respective local governments. Our cases prior to the 1970 statute, immediately after the 1970 statute, and since, even after the subsequent statutes in 1992 and 2000, have consistently applied the "in harmony with" standard.

Prior to the 1970 legislation, in 1954, in the case of *Oursler v. Bd. of Zoning Appeals*, 204 Md. 397, 401–02, 104 A.2d 568, 570 (1954), we noted:

"It is the function of the Zoning Commissioner, and the Board of Zoning Appeals on appeal, to determine whether or not any proposed use for which a special [exception] is sought *would be in harmony with* the general purposes and intent of the Zoning Regulations, and whether it could be conducted without being detrimental to the welfare of the neighborhood. Accordingly, in Baltimore County ... an applicant for a permit to conduct a restaurant in a residential zone ... must show only that the exception *would be in harmony with* the zoning plan...." [20] (Emphasis added.)

In March of 1970 (apparently prior to the effective date of the 1970 recodification), we decided *Rockville Fuel and Feed Co.*

---

**20.** The facts of this case indicate that the challenge mounted against the exception was based upon a lack of harmony with the zoning ordinance, not lack of conformance with the master or comprehensive plan.

*v. Board of Appeals,* 257 Md. 183, 188, 262 A.2d 499, 502 (1970). There, in interpreting our prior case of *Merlands Club, supra,* we stated:

"In *[Merlands Club],* we went to some pains to stress that the special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can, *prima facie,* properly be allowed in a specified use district, absent any fact or circumstance in a particular case which would change this presumptive finding. We said: 'The duties given to the Board are to judge whether the neighboring properties and the general neighborhood would be adversely affected, and whether the use, in the particular case, *is in harmony with the general purpose and intent of the zoning plan.*' In accord is *[Oursler]*." (Emphasis added.)

Then, just three years after the enactment of the 1970 legislation with its definition that included the use of the word "conform," we decided *Turner v. Hammond,* 270 Md. 41, 54–55, 310 A.2d 543, 550–51 (1973). There, shortly after the passage of the 1970 statute, we reiterated what had been said before:

"Occasionally the bar and less often the bench lose sight of the concept that the conditional use or special exception, as it is generally called, is a part of the comprehensive zoning plan sharing the presumption that as such it is in the interest of the general welfare and, therefore, valid....

"While the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements he does not have the burden of showing affirmatively that his proposed use accords with the general welfare.... [I]f there is no *probative* evidence of harm or disturbance in light of the nature of the zone involved *or of factors causing disharmony to the functioning of the comprehensive plan,* a denial of an application for

a special exception is arbitrary, capricious and illegal." (Last emphasis added.)

Eight years later, eleven years after the enactment of the 1970 legislation, we decided what some have called the seminal case in the Maryland law of special exceptions, *Schultz v. Pritts, supra,* and there, after the inclusion of the definition containing the word "conform," we recognized no substantive change caused by the 1970 legislation, reiterating the traditional and long accepted standard to be used by administrative entities considering special exceptions. In that case, Judge Rita Davidson, for the Court said:

"The special exception use is a part of the comprehensive zoning plan.... The duties given to the Board are to judge whether ... the use in the particular case is in harmony with the general purpose and intent of the plan.

"Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community.... But if there is no probative evidence of ... *factors causing disharmony to the operation of the comprehensive plan,* a denial of an application for a special exception use is arbitrary, capricious, and illegal." (Citations omitted.) (Emphasis added.)

*Schultz,* 291 Md. at 11, 432 A.2d at 1325. As relevant to the case at bar, we quoted the above emphasized language from *Schultz* as the special exception standard as late as our case of *Alviani v. Dixon,* 365 Md. 95, 113, 775 A.2d 1234, 1244 (2001). We conclude, therefore, that there is virtually no basis for the proposition that the 1970 recodification's use of the word "conform" in its definition of "special exception" was intended, or did, create a compliance absolutism in respect to comprehensive plans when appropriate administrative entities grant special exceptions.

### B. The 1992 Legislation[21]

We have not discovered any significant legislation between 1970 and 1992 that has special relevance to the issue being addressed, other than a failed statute in 1991 that ultimately found its substantive terms being incorporated in HB 1003 of 1992, which also failed of passage.

In 1992, the General Assembly was considering two bills in respect to land use and zoning that are relevant to the present issue—the Bill supported by advocates of state control—HB 1003, aforesaid, and the Administration Bill, HB 1195 (there were Senate counterparts). House Bill 1195 survived to become Chapter 437 of the Laws Maryland 1992. The proposed bills' titles are indicative of their general intent. House Bill 1195's title was *Economic Growth and Resources Act of 1992.* House Bill 1003's title was *Growth Management—Comprehensive Plan Enforcement.* The contrasting titles stated the issue and the conflict being debated in the General Assembly.

House Bill 1003 which provided that land use decisions must be "SUBSTANTIALLY CONSISTENT WITH THE PLAN," contained several other provisions that met with much opposition in the Legislature. There was a provision in the State Finance and Procurement section (5–409) of proposed HB 1003 that the "Office," (presumably the Office of State Planning):

"(B) ... SHALL REVIEW FOR SUBSTANTIAL CONSISTENCY WITH THE COMPREHENSIVE PLAN THE LAND USE LAW ADOPTED BY EACH JURISDICTION UNDER ARTICLE 66B, § 3.05(E) OF THE CODE.

---

21. The "Visions" aspect of Article 66B apparently first found its way into the law in a statute from the early 1990s and was repeated in this 1992 legislation. Likewise, the term "smart growth" first finds its way into the land use arena via the testimony of spokespersons for the Schaefer administration in 1992. References to 2020 legislation refers to a group called the 2020 Panel designated to study and develop plan proposals for inclusion in 1991 legislation that would meet the goals the 2020 Panel proposed to be met by the year 2020. The 1991 legislation apparently was not enacted.

(C) (1) THE OFFICE MAY TAKE 1 OR MORE OF THE ACTIONS STATED IN PARAGRAPH (4) OF THIS SECTION IF THE OFFICE DETERMINES THAT:

(I) A SUBSTANTIAL INCONSISTENCY BETWEEN A LOCAL JURISDICTION'S COMPREHENSIVE PLAN AND LAND USE LAW EXISTS:  AND

(II) THE INCONSISTENCY IS OF MORE THAN LO-CAL IMPACT, AND IS OF SUBSTANTIAL STATE OR REGIONAL CONCERN.

[ (4) ](III)IMPOSE A STATE FUNDING MORATORI-UM ON THE JURISDICTION, UNDER WHICH THE JURISDICTION MAY NOT RECEIVE ANY STATE FUNDS OR FEDERAL GRANT MONEYS THROUGH A STATE UNIT THAT SUPPORTS DEVELOPMENT IN THE JURISDICTION, INCLUDING THE FOLLOWING PROGRAMS:

1.  TRANSPORTATION TRUST FUND DISTRIBU-TION FOR NEW ROADS OR BRIDGES. . . .

2.  PUBLIC SCHOOL CONSTRUCTION PROGRAM DISTRIBUTIONS FOR NEW PUBLIC SCHOOL CON-STRUCTION OR EXPANSION OF EXISTING PUBLIC SCHOOLS

3.  WATER POLLUTION CONTROL FUND DIS-TRIBUTIONS FOR SEWERAGE SYSTEM CONSTRUC-TION OF NEW SYSTEMS OR EXPANSION OF EXIST-ING SYSTEMS. . . .

4.  STATE AID FOR POLICE PROTECTION FUND DISTRIBUTIONS RELATING TO ANY INCREASED AID IN THE LOCAL JURISDICTION. . . .

5.  STATE FIRE, RESCUE, AND AMBULANCE FUND DISTRIBUTIONS FOR NEW GRANTS OR IN-CREASED GRANTS. . . .

6.  THE PROCEEDS OF ANY BOND ISSUED UN-DER THE CHESAPEAKE BAY WATER QUALITY LOAN AS AUTHORIZED IN CONSOLIDATED BOND LEGISLATION FOR ANY FISCAL YEAR . . . FOR THE

ACQUISITION, CONSTRUCTION, OR EQUIPMENT OF NEW OR EXPANDED WATER SUPPLY FACILITIES."

HB 1003, as proposed, also contained a mandatory arbitration requirement that although it permitted local governments to request arbitration of any decision by the "Office," the "Office" in essence would control that process as well. The local jurisdiction and the "Office" selected the arbitrators, but only from "A LIST OF *LOCAL PLANNERS MAINTAINED BY THE OFFICE*" (Emphasis added.) The arbitration part of the statute concluded with

"(VII) THE FINAL DECISION OF THE PANEL SHALL BIND BOTH THE OFFICE AND THE LOCAL JURISDICTION, NEITHER THE OFFICE NOR THE LOCAL JURISDICTION MAY TAKE ANY ACTION ON THE MATTER INCONSISTENT WITH THE DECISION OF THE PANEL. *THE FINAL DECISION OF THE PANEL MAY NOT BE APPEALED TO ANY COURT*" (Emphasis added.)

In other words the "Office" made the decision, objections would be heard by the "Office's" arbitrators, and there would be absolutely no recourse in the courts for property owners.

As might be imagined, this Bill (and the opposing HB 1195) engendered intensive political and lobbying activity. The Bill files for the two bills includes the following indicating support for HB 1003 (less local control) or opposition to HB 1195 (more local control):

▶ League of Woman Voters of Maryland, Inc.

February 17, 1992

"The League of Women Voters supports HB 1003."

▶ Chesapeake Bay Foundation

February 17, 1992

*"Conclusion:*

House Bill 1003 provides for the two essential elements in a growth management bill—consistency and enforcement. We support HB 1003 with an amendment that would add the third element—establishment of a body to further dis-

cuss the implementation of the visions and growth management."

► The Johns Hopkins University Institute for Policy Studies

February 14, 1992

"Each of the bills before you has some merits, and each has some limitations. The Administration Bill (HB 1195) encourages economic growth, but does not focus it to areas of existing population, making it likely to further sprawl and use of the automobile. Further, the Administration Bill leaves implementation in the hands of local jurisdictions 'to the extent practicable,' which is unfortunately weak and meaningless language. We feel that Bill 1003 more closely meets our concerns, as it requires compliance and provides substantial penalties for noncompliance."

► Clean Water Action

February 17, 1992

"Clean Water Action strongly opposes HB 1195.... It vests total authority for implementing the visions with the local jurisdictions; does not require consistency; has no enforcement provisions...."

. . .

"Recognizing the necessity to build consensus, representatives of the environmental community have agreed over the past several months to seek a compromise position in order to move forward on this issue. In that spirit, amendments to an earlier draft of the Administration bill were offered. Those amendments were rejected in total in favor of a new and significantly weaker version of the administration bill-the version we are debating today.

. . .

"HOUSE BILL 1003

"Clean Water Action supports House Bill 1003 provided that it is amended to require a Commission, appointed by the

Governor, that is charged with developing guidelines, such as those described above, within which local jurisdictions are directed to implement the visions."

► Pam Lindstrom

POSITION: FWA(1195)

Audubon Naturalist Society

"SUMMARY OF TESTIMONY:

[W]ouldn't support HB 1195 w/o amndt's.

How you implement visions. (James Madison quote)

HB 1195 is more like the Articles of Confederation, than the Constitution.

This isn't enough. Would like to charge the Commission with looking at master plans and work on guidelines to implement."

► Jim Gracie

POSITION: OPP (1195); FWA (1003)

Tract Unlimited Volunteer

"SUMMARY OF TESTIMONY:

: . .

"Must remove 'to the extent practicable.' It's unenforceable. . . . [Y]ou need enforcement mechanisms, if consistency is required. Problems it causes in sensitive areas, they may not have the expertise at the local level."

► Jane Nichols

POSITION: FWA (BOTH)

Ches. Bay F"n

"SUMMARY OF TESTIMONY:

1195–not support unless w/ these amendments . . .

State whistleblowing authority is a must.

● consistency

● enforcement provision: Serious intent to withhold [state funds]; make it explicit.

● process for interpretation of vision (consist State and locals) accept regional. . . .

We support enactment w/ amendments only. W/o, 1195 is not effective. . . .

Chr: Do you think a different + better consensus could be developed for next year?

Jane: We know you'd take a risk: but 1195 isn't a consensus document, because it doesn't include the environmentalists. I believe that these three bullets aren't radical changes. Has your side, or [ ]other side done any attempt[ ] to meet?

VT: Concern over 'the bill'—I believe that some . . . testified that they don't have the ability to withhold some funds.

Jane: We'd prefer to see 'withholding' in the bill."

▶ Sierra Club

February 17, 1992

TESTIMONY OF NANCY DAVIS

"Last year [1991] the Sierra Club put great resources into supporting growth management legislation which was viewed by our membership as a compromise. We were willing to compromise in a spirit of cooperation for the higher goal of implementing the 2020 visions.

"Again, earlier this year we thought we were working in good faith with the administration to come up with meaningful growth management legislation. Sierra Club cannot support this legislation [HB 1195] as introduced. We cannot compromise away our goals for saving the Bay and our quality of life. We find the Bill [HB 1195] to be lacking in key elements:

a. [HB 1195] does not set specific guidelines or specific performance standards for protecting sensitive areas.

b. It does not require consistency between comprehensive plans and zoning regulations.

c. It does not call for a broad-based commission charged to create a framework that insures that the visions are implemented throughout the [S]tate.

d. There is no enforcement mechanism for non compliance.

e.  There is no time frame for compliance."

The support for the Administration Bill, HB 1195 (much of what also includes objections to HB 1003) included:

► Howard County Chamber of Commerce

March 3, 1992

"The Chamber supports *House Bill 1195 Economic Growth & Resources Act of 1992* and opposes *House Bill 1003 Growth Management–Comprehensive Plan Enforcement* for a number of reasons.

"Critical to the Chamber's support of House Bill 1195 is the addition of a seventh vision to the original six visions of last year's 2020 legislation.  That seventh vision recognizes the importance of economic growth throughout our [S]tate. We believes the bill balances other goals with that of economic growth and reducing increasing regulatory costs. We also support the bill because it permits region-wide planning and coordination between counties, but leaves ultimate responsibility for implementing the seven visions to local governments, who are most familiar with the problems their jurisdictions face.  We feel that House Bill 1195 provides a unique opportunity to encourage region-wide and state-wide planning but at the same time retain flexibility at the local level to deal with individual problems.  The Chamber of Commerce opposed House Bill 1003, because we believe that it does not offer the opportunity to address unique local problems in this matter."

► Maryland Builders Association

"We opposed last year's bill because it set up a State plan that was not responsive to the needs of local governments . . .

"This [HB 1195] is NOT a 'Nothing–Burger,' but is a rational approach to growth management that puts land use decisions in the hands of local governments, where it belongs."

► Maryland Builders Association

February 12, 1992

"Dear Chairman Guns:

"The Maryland Builders Association ... is OPPOSED to HB 1003 ... which you will hear in your Committee on February 17, 1992.

"We do not support giving the Maryland Office of Planning what amounts to a Veto over local government's comprehensive plans. Local elected officials and local planners are best suited to determine land use within their own jurisdictions.... We support the Administration's bill [HB 1195]....

"We do not support the total withholding of State funds, [provided for in HB 1003] nor should the Office of State Planning be dictating to the other [S]tate agencies what funds should be placed in a moratorium.

"We urge an UNFAVORABLE report on HB 1003"

▶ Carroll County Chamber of Commerce

February 18, 1992

"The Legislative Committee of the Carroll County Chamber of Commerce opposes this bill [HB 1003]. Bureaucrats in the Office of State Planning could superimpose their views on decisions made by local elected officials.

"We therefore ask that your committee members give this bill an unfavorable report."

▶ Maryland Municipal League

February 17, 1992

"The Maryland Municipal League [MML] ... has consistently endorsed the goals of the visions of 2020 and the protection of sensitive areas. In HB 1195, the Administration has provided a vehicle that addresses these ends while retaining the role of municipal and county governments in establishing how these ends will be met. Within this framework of local determination, the League supports the Administration's efforts through HB 1195 to meet the objections raised by MML and other parties to 2020 legislation that was considered during the 1991 General Assembly session. League objections last year included the supplant-

ing of the planning judgments of local elected officials by non-elected [S]tate officials, the imposition of unfunded [S]tate mandates, and the fact that future growth would be channeled around the existing cities and towns without addressing the need to annex those growth areas.

"For the same reasons, the League opposes the approach offered in HB 1003. While the Administration's bill [HB 1195] ensures that decision making concerning local sensitive areas protection and implementation of the visions is made by local elected officials throughout the [S]tate, HB 1003 provides for such judgements to be made ultimately by non-elected state officials in Baltimore unfamiliar with local conditions. Moreover, in these difficult economic times for both state and local governments, HB 1003 provides for a most severe club of revenue withholding powers wielded in Baltimore to ensure that the judgments of [S]tate bureaucrats are implemented locally.

"The Maryland Municipal League urges this committee to provide a favorable report to HB 1195. We feel however that it is particularly important that this be done without the inclusion of amendments that will once again raise the concerns of local government about [S]tate intrusion into local planning and zoning authority."

▶ State of Maryland

Office of the Governor

Testimony of Steven B. Larsen, Governor's Legislative Office "The legislation [HB 1195] takes into account the need for economic growth. The framework for this legislation is the 'visions' conceived by the 2020 Panel of Experts. Importantly, the six visions of the Panel have been expanded to include a seventh vision[:] Economic Growth is Encouraged and Regulatory Mechanisms are Streamlined.

. . .

● Environmentally sensitive areas will be addressed in a new 'Sensitive Areas' element in comprehensive plans.

The bill leaves the responsibility for defining and determining the specific level of protection to each local jurisdiction. . . .

● Local jurisdictions are encouraged to streamline their review processes, promote flexible development standards which can lower costs, protect the environment and promote better site design, and *direct new growth to designated areas.* (Emphasis added.)

● Each jurisdiction will follow a procedure to ensure that zoning ordinances, subdivision regulations, and other land development regulations implement the comprehensive plan and the visions. The bills [HB 1195 and its Senate companion SB 611] provide for no State approval process, but establish a cooperative process whereby the responsibility for preparation and approval lies with local jurisdictions and the responsibility for reporting and review is assigned to the Economic Growth and Resource Commission [an entity created by the legislation].

. . .

## "*IV.  Conclusion*

"The experience of Maryland and other states across the country is that when it comes to growth management legislation, it is both the product and the process that matter. HB 1195/SB 611 allow Maryland's governments and interest groups to use the comprehensive planning process to work together to resolve the difficult issues of growth in an equitable manner, *based on the tradition of local land use planning.*" (Emphasis added.)

▶ Mayor's Task Force for Liaison with the General Assembly

Mr. Ernest Freeman

Director of the [Baltimore City] Planning Department

February 17, 1992

"This recognition of the unique conditions and regulatory structure of the local governments is essential because one set of rigid guidelines is not appropriate for the various conditions encountered across the [S]tate."

► Maryland Association of Counties, Incorporated

February 19, 1992

"Dear Governor Schaefer:

. . .

"The genius of the proposed legislation is its equitable balancing of both local and State interests. The planning process remains a local responsibility with primary future guidance being obtained from the visions adopted by the 2020 Commission."

► Maryland Farm Bureau

February 17, 1992

"MY NAME IS WILLIAM KNILL.... I AM HERE TODAY AS PRESIDENT OF MARYLAND FARM BUREAU ... WITH OVER 14,300 MEMBERS FROM 23 COUNTY FARM BUREAU ASSOCIATIONS....

"IT HAS BEEN PROVEN THAT SINGLE MINDED CENTRAL CONTROL DOES NOT SERVE A POPULATION VERY WELL.

"IT IS WITH THESE THOUGHTS IN MIND THAT MARYLAND FARM BUREAU COMES HERE TODAY TO SUPPORT H.B.–1195. WE HAVE ALWAYS FELT THAT ONE SHOE DOES NOT FILL ALL. THIS BILL ALLOWS COUNTIES TO PLAN FOR THEIR PARTICULAR NEEDS–WITH LOCAL PEOPLE DECIDING WHAT SERVES THEIR SITUATION BEST. WE FEEL USE OF THE VISIONS AS A BASIS FOR GUIDANCE AND PLANNING, AND THE ABILITY OF LOCAL PLANNING TO ADDRESS THESE NEEDS, WILL FURTHER THE DESIRED GOALS OF GROWTH MANAGEMENT.

"... WE BELIEVE THAT TO ACHIEVE THE BEST GROWTH MANAGEMENT, WE NEED THE IMAGINATION OF LOCAL PEOPLE, PLANNING AND MAKING CHANGES TO MEET THEIR LOCAL NEEDS AND THE STATE'S GOALS, ONLY THEN WILL THE

NEEDED PROTECTION BE EMBRACED AND SUPPORTED BY THE PEOPLE."

▶ House Bill 1195

By: The Speaker (Administration)

"House Bill 1195 establishes managed growth in Maryland, implemented through local government. . . .

. . .

"In particular, House Bill 1195 accomplishes the following: With respect to local planning:

. . .

● However, local jurisdictions need only do the implementation in zoning and subdivision ordinances *to the extent practicable,* when using existing resources and additional resources as they become available.

  ● Only local jurisdictions have authority to adopt regulations on the implementation of the Visions in a comprehensive plans." (Emphasis added.)

▶ LHIW Land Investors

February 11, 1992

"I am writing to ask your support for HB 1195, which most importantly preserves a strong element of local elected control over the planning and zoning process rather than centralizing control in the hands of unelected, State employees. HB 1003 contains much of the same bad legislation that generated the statewide citizen opposition and defeat of the '2020 Bill' last year."

▶ John Baus

    POSITION: FAV (1195); OPP (1003)

REPRESENTING: Md. Bankers Ass'n

"SUMMARY OF TESTIMONY:

We participated this summer, after being left off of 2020. One size doesn't fit all; HB 1195 helps. We feel that there

are adequate protections in this bill. This strikes the appropriate balance." [22]

In addition to the testimony (oral or written) of the advocates for the various bills, certain other documents contained in the bill files tend to help establish what the Legislature thought it was debating and then what it was enacting when it passed HB 1195. Certain amendments were added in the Conference Committee during the conference between the Senate and House versions. One of these amendments stated: "[A]fter 'powers' insert 'and is intended to provide for the protection of sensitive areas, incorporation of the visions developed under the Chesapeake Bay Agreement, and more efficient land use *through local government planning and zoning powers.*' " (Emphasis added.) Another amendment provided:

"*(2) THE FOLLOWING SENSITIVE AREAS IN THE LOCAL JURISDICTION SHALL BE CONTROLLED UNDER THE REQUIREMENTS OF THIS SECTION:*

*(I) STREAMS AND THEIR BUFFERS:*

*(II) 100–YEAR FLOOD PLAINS:*

*(III) HABITATS OF THREATENED AND ENDANGERED SPECIES: AND*

*(IV) STEEP SLOPES.*

*(3) THE APPLICATION OF THIS SECTION TO A LOCAL JURISDICTION CEASES UPON THE ADOP-*

---

22. The purpose of including the extensive contents of the bill files in this opinion is not to proffer acceptance or non-acceptance of any speaker's or writer's stated position. It is included to show how the controversy over the two bills (HB 1003 and HB 1195) set the stage for the issue over whether local control or state control (i.e., mandated requirements by Art. 66B that local governments completely comply with master plans approved by State entities in considering special exceptions) was intended by the Legislature. The two bills, and the discussions in regard to them clearly lay out what was occurring in 1992 in the Legislature between advocates of local control (local governments and various economic interests) and advocates of state control via mandates. Simply stated HB 1003, if enacted, would have established strong state control and enforcement; HB 1195 strongly reaffirmed local control and enforcement. HB 1195 passed; HB 1003 did not.

TION OF A SENSITIVE AREAS ELEMENT BY THE JURISDICTION.

*(B) THE REQUIREMENTS OF THIS SECTION ARE NOT INTENDED TO BE CONSTRUED AS A MODEL FOR LOCAL JURISDICTIONS. A LOCAL JURISDICTION. IN COMPLYING WITH ARTICLE 66B, § 3.05(A) OF THE CODE. HAS SOLE AUTHORITY TO DETERMINE REQUIREMENTS OF THE SENSITIVE AREAS ELEMENT IN THAT JURISDICTION AND MAY ADOPT DIFFERENT. GREATER. OR LESSER STANDARDS THAN THOSE ADOPTED BY THE COMMISSION UNDER THIS SECTION."*

In the Floor Report in the House on Bill 1195, the Speaker proffered that:

"House Bill 1195 is the most recent attempt to shape the management of growth in Maryland. The chronology of the latest initiative concerning growth management in Maryland can be traced as follows:

The 1987 Chesapeake Bay Agreement. . . .

April 1988. Establishment of the Year 2020 Panel. . . .

December 1988. Year 2020 Panel Report. . . .

October 1989. Governor's Commission on Growth in the Chesapeake Region. . . .

January 1991. Maryland Growth and Chesapeake Bay Protection Act. . . .

March 1991. Legislative leadership defers judgment on the Administration's proposal.

May 1991. Legislative Policy Committee establishes Joint Committee. . . .

July 1991. Appointment of Special Joint Committee on Growth Management.

January 1992. Economic Growth and Resource Act of 1992 [HB 1195].

. . .

"House Bill 1195 puts into place a set of planning visions or principles which not only bring into focus the financial issues before local and state governments, but also issues related to the environment, resource utilization, economic growth, and the balancing of these competing interests. These same visions are to be used by the State in considering [S]tate funding of projects.

*"Under the bill, the authority for planning and zoning decisions remains at the local level. However, the bill does provide for additional guidance as to the composition of local plans* [in the case at bar the local master plans and other relevant plans needing approval had been approved]. Further, the actions of local governments are to be monitored by the reconstituted State Economic Growth and Resource Commission." (Emphasis added.)

In February of 1992 as HB 1195 and HB 1003 were being debated in the Legislature, the Chairman of the Environmental Matters Committee requested answers to a series of questions from the Attorney General of Maryland in respect to HB 1195. In a letter dated February 7, 1992, the Office of the Attorney General responded in part as follows:

" '1. **What is the impact of using the term "Policy," rather than "Statement," in terms of the Office [of Planning's] ability to adopt regulations, whether "interpretive" or "legislative?" In particular, regulations on the contents of local comprehensive plans, and on locally undertaken infrastructure projects with partial [S]tate funding.'**

"In my view, House Bill 1195, does not confer authority on the Office of Planning to adopt 'legislative rules' to implement the economic and growth and resource visions.... *The Office's general rulemaking authority is not affected or augmented by the bill; and, in my opinion, it would not be sufficient to allow the agency to promulgate legislative rules such as mandatory development standards.*

. . .

"But, any State regulations adopted would not be able to dictate the contents of local comprehensive plans, because such regulatory authority is vested by the bill 'solely' in the legislative body of the local jurisdictions.

. . .

" '4. Does the bill allow the State to intervene in local planning processes or decisions for allegedly failing to comply with the State Economic Growth and Resource Policy, regardless of the local implementation of similar visions under Article 66B, § 3.06(b)?'

"However, under House Bill 1195, local planning processes or decisions are governed by the local visions, not the State policies and are subject to local, not State, regulation. *Thus, even if the Office of Planning intervened in a local proceeding, it could not successfully allege a failure of the local government to comply with the State policies.*"[23] (Emphasis added.)

As these communications make clear, the Office of the Attorney General was advising the Chairman of the Environmental Affairs Committee during the journey of HB 1195 through the Legislature, that the Bill would not permit the Office of State Planning to impose mandatory requirements on local governments of the nature that would require local governments to absolutely comply with every provision of the various master and/or comprehensive plans that local governments might adopt. There is nothing in that exchange of questions and answers that would elevate the use of the word "conform," or any other language of the pre–1992 statutes beyond the traditional "in harmony with" standard when considering special exceptions. Additionally, the fiscal notes in the file in respect to the competing bills (HB 1003 which failed of passage and HB 1195 which was enacted) further affirm that

---

23. The Attorney General, in his amicus brief for the Maryland Office of Planning, argues differently in the case *sub judice.*

the difference between the bills was an example of the competing interests then contending for Legislative approval of their positions-HB 1003 (advocates of state control) and HB 1195 (advocates of local control). The fiscal note to HB 1003 provides in a relevant part that HB 1003:

> "● sets forth that the Office on Planning is (1) required to review efforts taken by local governments to legally incorporate these plan changes; and (2) authorized to take certain action to 'rectify a substantial inconsistency between the jurisdiction's comprehensive plan and land use law [defined]' which includes imposing a State funding moratorium (State and federal grant moneys) on selected programs ... [.]

The fiscal notes in respect to HB 1195 provided after first reader and after the bill was enrolled, as relevant here, quoted at length from one of the Attorney General's opinion letters, *supra*, a small portion of which, stated that:

> "● '... under House Bill 1195, local planning processes or decisions are governed by the local visions, not the State policies and are subject to local, not State, regulation.'"

Additionally, a summary of HB 1195 presented at a hearing on February 17, 1992, contained further language reaffirming the intention that local control be maintained. "This Bill enables planned management of growth at the local level, with the help of the State ... rather than as the top-down mandate of specific planning standards in Last Year's Bills." Later the summary report addressed several questions. One was "Why Shouldn't Land-Use Ordinances, Like Zoning And Subdivision Ordinances, Be *Consistent* With Comprehensive Plans?" The report specifically answered that question:

> "An absolute consistency requirement would create an unworkable situation in local planning processes. The zoning map would have to mirror the comprehensive master plan if consistency were required.
>
> "There is typically a considerable time delay between the adoption of a master plan and the adoption of the implementing zoning and subdivision ordinances, 1 or 2 years in

SOME CASES. MASTER PLANS WILL HAVE TO BE GOOD FOR 6 YEARS UNDER THIS BILL. BETWEEN THE TWO, AN ABSOLUTE CONSISTENCY REQUIREMENT WOULD HAMSTRING A LOCAL JURISDICTION'S ABILITY TO REACT TO CHANGES IN ITS ECONOMY AND ENVIRONMENT."

Our review of the legislative history of the successful 1992 legislation, HB 1195, clearly indicates that the legislation was not intended to impose on local governments a requirement that in applying their special exception provisions, they must comply absolutely and completely with the suggestions of their master plans or of the visions contained in those plans (or as laid out in Article 66B); neither does that review indicate that the General Assembly believed that it was conferring enforcement powers on the Office of State Planning. Had it chose to do the latter, it merely had to enact HB 1003 instead of HB 1195.

Accordingly, we find nothing in the history of the 1992 legislation, or the failed 1991 legislation, that remotely indicates that the Legislature believed that it was establishing that the use of the word "conform" in the 1970 statute and as stated in Article 66B, without additional restrictive language which was not added, imposed any stricter standard on such land use decisions than the traditional "in harmony with" language of the pre–1970 statute or our pre- and post–1970 cases.

### C. The 2000 Legislation

Two chapters of the Laws of Maryland 2000 concern land use issues. Neither chapter relates to any substantive changes in respect to the specific issue now before the Court. In 1999, a bill was introduced (HB 658) which combined substantive and non-substantive changes to Article 66B. The concept of combining substantive and non-substantive provisions in one bill created concerns and the 1999 bill was not passed. Instead it was sent to "summer study." As a result, in 2000, the non-substantive and substantive changes were presented as two separate bills. The non-substantive changes were presented in House Bill 889 (there was a companion Senate Bill), which ultimately became Chapter 426 of the Laws of Mary-

land 2000. The substantive changes were presented in Senate Bill 523 (there was a companion House Bill), which ultimately became Chapter 427 of the Laws of Maryland 2000.

Chapter 426 (House Bill 889), "AN ACT concerning **Growth Management—Land Use Definitions and Controls**" notes in its purposes clause: [24]

> "FOR the purpose of revising, restating, and recodifying the growth management and land use laws of the State; renaming Article 66B—Zoning and Planning of Annotated Code of Maryland to be Article 66B–Land Use; and making stylistic changes in the growth management and land use laws of the State."

Chapter 426 of the Laws of Maryland 2000, as it relates to definitions, merely repositioned the definition sections of Article 66B. The language of the definition of Special Exception remained the same. The Drafter's Note stated: "This section [§ 1.00 "Definitions.] is transferred without substantive change from former § 3.06(b) of this article." There is nothing contained in this statute relating in any way to any change of intent in respect to local control or any change that would indicate that the continued use of the term "conform" in the special exception provision, was intended to impose any new sort of absolute requirement for complete compliance with what have been long considered general guides-master and comprehensive plans and the like.

More important, perhaps, were the substantive changes made (and not made) in Article 66B by the adoption of Chapter 427 of the Laws of Maryland 2000 (Senate Bill 523). This chapter increased the power of certain local governments to utilize new procedures to lessen zoning restrictions by creating various new instruments that can affect changes in zoning. In other words, Chapter 427 increased the power of local governments—not decreased that power. It empowered local governments to adopt an "adaptive reuse" procedure that under certain circumstances allowed a local government to

---

**24.** We acknowledge that purposes clauses are not normally absolute indications of the Legislature's intent when passing a statute.

change the permitted uses of specified properties without the necessity of changing the zoning ordinance. Additionally, Chapter 427 empowered local governments to authorize, under certain circumstances, "administrative adjustments" to the provisions required under the zoning ordinance. Chapter 427 provides, as relevant to the added power of local governments:

"[1.00](D) (1) A LOCAL LEGISLATIVE BODY MAY AUTHORIZE THE PLANNING DIRECTOR OR AN-OTHER DESIGNEE TO GRANT ADMINISTRATIVE ADJUSTMENTS FROM THE FOLLOWING REQUIRE-MENTS IN A ZONING ORDINANCE ENACTED BY THE LOCAL LEGISLATIVE BODY:

(I) LOCAL HEIGHT REQUIREMENTS;

(II) LOCAL SETBACK REQUIREMENTS;

(III) LOCAL BULK REQUIREMENTS;

(IV) LOCAL PARKING REQUIREMENTS;

(V) LOCAL LOADING, DIMENSIONAL, OR AREA REQUIREMENTS; OR

(VI) SIMILAR LOCAL REQUIREMENTS."

That the chapter next above was intended further to empower, not restrict, local governments is not only clear from the plain language of the statute, but also from the limited legislative history available.[25] As relevant to the present issue that legislative history, in part, provides:

▶ Maryland Association of Counties, Incorporated
March 9, 2000

"The Maryland Association of Counties (MACo) **SUP-PORTS** Senate Bill 523. This bill would amend several provisions of the State zoning and planning law, Article 66B. SB 523 represents the efforts of the 66B Study Commission formed by the Speaker and President to develop consensus amendments to provide new tools and enhanced flexibility to local government zoning practices....

---

**25.** The legislative history documents have not yet been forwarded to the Department of Legislative Reference. Neither have they been re-formatted on microfiche. We were able to examine the documents that remain in the bill files of the pertinent legislative committees.

"First, SB 523 would authorize a planning director or a designee to grant administrative adjustments....

"Second, the bill provides a new tool to local legislative bodies, allowing approval of an 'adaptive reuse' of a property...."

► Maryland State Builders Association (MSBA)

March 9, 2000

"... (MSBA) ... supports Senate Bill 523 (Land Use).

"... The tools [adaptive reuse and administrative adjustments] could assist counties in offering alternative uses for land and avoid issues of 'takings' of personal [real] property."

► Maryland Municipal League (MML)

March 9, 2000

"... SB 523 attempts to make some of the substantive revisions included in the 1999 legislation that would provide greater planning and zoning authority to local jurisdictions subject to Article 66B.

"... One such provision authorizes a local legislative body to [authorize] the planning director or other designee to grant administrative adjustments.... [M]inor adjustments could be made without going to the board of zoning appeals."

► Maryland Office of Planning

March 28, 2000

"The Maryland Office of Planning is pleased to offer its support of Senate Bill 523. This Bill will authorize local jurisdictions to undertake some of the innovative planning concepts that evolved from the work of ... the Legislature's Article 66B Study Commission.

"The Maryland Office of Planning is particularly pleased that SB 523 reflects sound smart growth policy, especially in the area of regulatory streamlining. Senate Bill 523's authorization of 'administrative adjustments' should go far in reducing the need for formal Board of Appeals hearings for growth-related projects in those localities that desire to use such a tool....

"Another common-sense smart growth tool is the creation of 'adaptive reuse'.... [T]he adaptive reuse concept simply provides another good alternative for revitalization and re-development in older urban areas."

▸ Department of Legislative Services

Maryland General Assembly

2000  Session

FISCAL NOTE

### "Analysis

"**Bill Summary:** This bill authorizes a local legislative body of a commissioner or code home rule county to authorize the planning director or other designee to grant administrative adjustments from specified requirements in a zoning ordinance....

"A local legislative body may also authorize how the uses allowed in a zoning classification are to be applied to a particular improved property by granting an 'adaptive reuse'....

. . .

"**Background:** This bill is a[n] ... attempt to provide greater authority to code home rule and commission counties with respect to zoning and planning."

The Committee files examined by the Court contained no positions opposing the passage of Senate Bill 523. We found nothing in the 2000 legislation, Chapters 426 and 427 that remotely indicates that the 2000 legislation was intended to restrict the power of local governments in the area of land use. In fact, the contrary is the only interpretation of that legislation that is possible.

### The conclusion as to the statutes pre–1970, the 1970 statutes, the failed 1991 statutes, the failed and enacted 1992 statutes and the 2000 legislation

In our extensive review of the statutes we have found no indication that any of the statutes actually enacted by the

Legislature were intended to diminish the local control of land use issues, albeit many additional considerations were imposed upon local governments in their planning processes. Generally, in the legislative battles between the advocates of increasing (if not total) state control of land use issues and the advocates of local control, the forces supporting local control invariably have prevailed in the Legislature.

More specifically, neither have we found a single indication that when the word "conform" first found its way into the definition of "special exception" that it was intended to modify or restrict the use of the traditional "in harmony with" standard that had previously prevailed. Nor have we found a single instance since 1970 that offers any evidence that the Legislature has thereafter desired to have the word "conform" be defined as a requirement that local governments must absolutely meet every local guide, every local or State vision, or every local desire mentioned in their respective master plans, comprehensive plans or the like.

Moreover, if a special exception had to meet every provision in the master plans, zoning ordinances and the like, they would not be exceptions in the first instance—they would be in compliance. Likewise, if "visions" were absolutes, they would be "real" requirements not visionary aspirations.

The *Random House Dictionary of the English Language* 1597 (1983), as relevant here, provides:

> "vi•sion ... 2. the act or power of anticipating that which will or may come to be ... 5. a vivid, imaginative conception or anticipation: *to have visions of wealth and glory.* ... 7. a sight that resembles something seen in a vision, dream, etc. . . . ."

*Webster's Third New International Dictionary* 2557 (3rd ed.1961), provides, as relevant here:

> " [1] vi•sion ... something seen otherwise than by the ordinary sight; an imaginary, supernatural, or prophetic

sight . . . a vivid concept or object of imaginative contemplation. . . ."

" [2] **vision** . . . **2:** to see in or as if in a vision: IMAGINE, ENVISION . . .

It is clear to the Court, in light of the legislative history surrounding land use legislation over the last 25 years (or longer even) that the use of the words "conform" and "visions" were never intended by the Legislature to impose absolute requirements on local governments in their practices involving their local land use programs.

Could the State find ways to impose absolutely mandatory requirements on local governments in the exercise of local controls? As we have noted—probably. But, the Legislature has been asked time and again to do so, and time and again it has intentionally declined to do so when offered the opportunity.[26] In light of that history, the use of the word "conform," standing alone, in the 1970 definition does not create such a mandatory requirement.

**JUDGMENT OF THE COURT OF THE SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS.**

HARRELL, Judge which RAKER and BATTAGLIA, Judges, Join.

I dissent. Although there are significant portions of the Majority opinion that are scholarly and commendable, it im-

---

**26.** In that the only proper question before this Court has been adequately addressed, we shall reiterate only briefly that had "conform" been construed to require a higher level (if one exists) of absolute compliance, it appears to the Court from our own assessment of the facts in the record, the conclusions of the administrative entity and the opinion of Court of Special Appeals, that the Board, in any event, made a decision that was not arbitrary, capricious, and unsupported by fact under any definition of "conform" proffered by petitioners. As noted earlier, however, in our present determination, we (as did the Court of Special Appeals) are affirming the decision of the Board for the reasons it gave for that decision.

properly dissects and assembles the relevant statutes and case law.

### A.

To my reading, the Majority opinion urges that, because local, non-charter governments are free to choose to implement (or not) the grant of zoning and planning powers from the State Legislature, the non-procedural mandates of Article 66B, the source of the authority to enact those powers, largely need not be followed by such governments that elect to adopt local zoning and planning. The Majority opinion states, "[w]hat [Article 66B] did was to empower [local jurisdictions to adopt zoning], if they chose to do so, and if they so choose, Article 66B imposed *suggestions, guides, and in some instances, restrictions on how it was to be done.*" Majority op. at 534, 943 A.2d 1192, 1199 (emphasis added). This overly broad conclusion is not borne out by the actual language of Article 66B; indeed, the Majority opinion fails to cite a single instance in the Article demonstrating its "suggestive" or "guidance" only grants of power.

A plain reading of Article 66B suggests, instead, that the General Assembly established many requirements in delegating to, and authorizing implementation of, zoning and planning powers for non-charter counties.[1] The Article details the composition of a local planning commission, including appointment, removal, and composition. Maryland Code (1957, 2003 Repl.Vol.), Article 66B, § 3.02. The Article requires the commission to hold a certain number of meetings, to adopt rules, to keep records, and describes the commission's powers. *Id.*

---

1. The constraints of the law vary for local jurisdictions and are dependent on the empowering Article of the Maryland Code. *Mayor & City Council of Rockville v. Rylyns Enters., Inc.,* 372 Md. 514 n. 3, 528, 814 A.2d 469, 477 n. 3 (2002). Most charter counties exercise greater freedom because the Maryland Code sketches only the boundaries of available local power concerning zoning and planning for these entities. *See* Maryland Code (1957, 2005 Repl.Vol.), Article 25A, §§ 5(U) & 5(X). The Maryland Code, Article 66B, describes the constraints on non-charter counties with far greater clarity.

§ 3.03–3.04. The planning commission is required by the Code to "make and approve a plan which the commission shall recommend to the local legislative body for adoption." *Id.* § 3.05. Similarly, the Article defines the composition, appointment, terms, and powers for a zoning board of appeals in a non-charter county. *Id.* § 4.07.

The Article plainly supplies definitions of the zoning tools available for adoption by non-charter counties. In relevant part, "plan" is defined as "the policies, statements, goals, and interrelated plans for private and public land use, transportation, and community facilities documented in texts and maps which constitute the guide for the area's future development." *Id.* § 1.00(h). A constituent part of the "plan" includes "a general plan, master plan, comprehensive plan, or community plan adopted in accordance with §§ 3.01–3.09." *Id.* "Special exception" is defined as a "grant of a specific use that would not be appropriate generally or without restriction and shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, that the use *conforms to the plan* and is compatible with the existing neighborhood." *Id.* § 1.00(k) (emphasis added).[2]

---

**2.** Compared to this very structured empowerment of non-charter counties, the Maryland Code leaves much more leeway to the people and local governments of charter counties. Where Article 66B details the composition of the board of appeals and planning commission, Article 25A, addressing the same for charter counties, empowers a local government to detail the structure and powers granted the board of appeals and is silent concerning the planning commission. Maryland Code, Article 25A, §§ 5(U), 5(X). Similarly, where Article 66B defines precisely how a local body may zone, Article 25A broadly grants to charter counties the power to determine that for itself. *Compare* Maryland Code, Article 25A, § 5(X) (granting the local government the power to enact local laws relating to zoning) *with* Maryland Code, Article 66B, § 4.01 (defining what a local legislative body may regulate and restrict in the process of zoning). Furthermore, unlike Article 66B, which defines the tools that a local jurisdiction may use to zone, Article 25A conspicuously lacks a central definitional section. It seems that charter counties are to determine the meaning of words such as "special exception" for themselves, a distinction that well may explain and distinguish a number of the cases relied on in the Majority opinion and which arise in a charter county context.

The view that Article 66B provides local jurisdictions with mostly mere "suggestions" is undermined by the fact that the General Assembly painstakingly detailed the form and substance of local administrative zoning bodies. If the bulk of Article 66B is mere guidance, as the Majority opinion seems to suggest, the General Assembly had no reason to define the terms "plan" and "special exception." Reading Article 66B in its entirety compels the conclusion that it intended to define specifically and limit the powers delegated to non-charter counties. *See Bd. of County Comm'rs of Cecil County v. Gaster*, 285 Md. 233, 243, 401 A.2d 666, 671 (1979) (finding that the Maryland Code required implementation of the plan with respect to subdivision regulations); *accord Height v. State*, 225 Md. 251, 257, 170 A.2d 212, 214 (1961) ("[A]ll parts and sections of [an] Article . . . must be read and considered together in arriving at the true intention of the legislature, as they form part of a general system."); *State v. Petrushansky*, 183 Md. 67, 71, 36 A.2d 533, 535 (1944) ("The proper rule of construction is that all parts of such an article of the Code . . . , must be read together as they form part of a general system.").

A local administrative agency is bound to apply the law of the State and local legislatures. *Dal Maso v. Bd. of Prince George's County*, 182 Md. 200, 205, 34 A.2d 464, 466 (1943) ("Administrative boards and officials are arms and instrumentalities of the Legislature, and are not judicial at all; they belong to and derive all their authority from the legislative branch under our form of government."); *Dal Maso*, 182 Md. at 205, 34 A.2d at 466 ("The powers conferred by the Legislature are powers which belong to it, and which the public necessity and convenience require to be administered by its creatures."). Where it does not, the reviewing court must reverse the findings of that administrative agency and generally remand the matter with instructions that the proper standard be applied. *Liberty Nursing Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 330 Md. 433, 443, 624 A.2d 941, 946 (1993) ("When . . . the issue before the agency for resolution is one solely of law, ordinarily no deference is appropriate and

the reviewing court may substitute its judgment for that of the agency.); *People's Counsel for Balt. County v. Md. Marine Mfg. Co.*, 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989) ("[A] reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law.").

In the present case, the standard to be applied by the administrative agency is defined plainly in Article 66B. The definition of special exception requires specific considerations. It "shall be based upon a finding that certain conditions governing special exceptions as detailed in the zoning ordinance exist, that the use *conforms to the plan* and is compatible with the existing neighborhood." Maryland Code, Article 66B, § 1.00(k) (emphasis added). This Court has noted repeatedly that where statutes or local ordinances linking planning and zoning exist, "they serve to elevate the status of comprehensive plans to the level of true regulatory device." *Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 530–31, 814 A.2d 469, 478 (2002) (footnote omitted). The Court may not ignore the linkage established by the General Assembly in defining "special exception" and "plan." *See Md. Overpak Corp. v. Mayor & City Council of Balt.*, 395 Md. 16, 47–48, 909 A.2d 235, 253–54 (2006) ("[A] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute with forced or subtle interpretations that limit or extend its application." (quoting *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576, 870 A.2d 186, 193 (2005))); *see also Barbre v. Pope*, 402 Md. 157, 173, 935 A.2d 699, 709 (2007) ("If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." (citing *Dep't of Health & Mental Hygiene v. Kelly*, 397 Md. 399, 419, 918 A.2d 470, 482 (2007); *City of Frederick v. Pickett*, 392 Md. 411, 427, 897 A.2d 228, 237 (2006); *Davis v. Slater*, 383 Md. 599, 604–05, 861 A.2d 78, 81 (2004))); *Mayor & City Council of Balt. v. Hackley*, 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984) ("[I]f there is no ambiguity or obscurity in the language of a statute, there is usually no need to look

elsewhere to ascertain the intent of the General Assembly. Further, a court may not insert or omit words to make a statute express an intention not evidenced in its original form.").

In a situation analogous to the present case, a term was defined by statute, but a local administrative board failed to apply the statutory definition, leading the Court of Special Appeals to determine that

> [the Board] was bound by the legislative definition of the word ... as defined in the statute which would not permit the Board to construe such a word according to its meaning in common parlance where that meaning differs from the legislative definition.... We agree with the trial judge that the Board erred in selecting the meaning of the word ... which appeared to it to be most reasonable under the circumstances. In the light of the clear and unequivocal definition ... set out in the zoning ordinance, the Board was bound to accept that definition as the intended meaning of that word.

*Mayor & City Council of Balt. v. Bruce,* 46 Md.App. 704, 712–13, 420 A.2d 1272, 1277 (1980) (declaring invalid the Zoning Board's decision to deny a specific use permit invalid because the Board failed to apply the definition of the term "use" clearly and unequivocally set out in the zoning ordinance).

Chief Judge Bell, while a judge of the Court of Special Appeals, similarly wrote that

> [t]he definition ... in [the section] applies whenever the term ... is used throughout the ordinance. Thus [the section] cannot be read without reference to that definition. To do otherwise would be to fail to adhere to a venerable precept of statutory construction: "if there is no clear indication to the contrary, a statute must be read so that no part of it is rendered surplusage, superfluous, meaningless or nugatory."

*Green v. Bair,* 77 Md.App. 144, 150, 549 A.2d 762, 765 (1988) (quoting *Ford Motor Land Dev. v. Comptroller of the Trea-*

*sury,* 68 Md.App. 342, 346, 511 A.2d 578, 580 (1986)), *cert. denied, Green v. Bair,* 315 Md. 307, 554 A.2d 393 (1989).

## B.

To reach its conclusion that "in harmony" with the plan is the proper standard for assessing the subject special exception application in Allegany County, the Majority opinion first relies on case law it claims demonstrates that "in harmony" with the plan was the common law standard used before enactment of the 1970 legislation defining in Article 66B, for the first time, "special exception." To the contrary, the cases discussed by the Majority are not directed to the "plan" to which the 1970 amendment of Article 66B requires that special exceptions must conform. As previously noted, "plan," as defined by the Article, means "the guide for the area's future development." Maryland Code, Article 66B, § 1.00(h). The pre–1970 cases relied on by the Majority opinion indicate instead that the "in harmony with" standard was directed toward the local zoning ordinance regulations standing alone, which the common law accorded the same meaning as the "comprehensive plan." We said in *Montgomery County v. Merlands Club,* 202 Md. 279, 287, 96 A.2d 261 (1953), that "[t]he duties given to the board are to judge ... whether the use, in the particular case, is in harmony with the general purpose and intent of the *zoning plan.*" In *Oursler v. Board of Zoning Appeals,* 204 Md. 397, 401–02, 104 A.2d 568–70 (1954), we clarified,

> [i]t is the function of the Zoning Commissioner, and the Board of Zoning Appeals on appeal, to determine whether or not any proposed use for which a special permit is sought would be in harmony with the general purposes and intent of the *Zoning Regulations* ... [A]n applicant ... must show only that the exception would be in harmony with the *zoning plan* .... (emphasis added).[3]

---

**3.** Citing this case for the contention that the common law standard was applicable to the comprehensive plan, the Majority opinion footnotes that "[t]he facts of this case indicate that the challenge mounted against

The Majority opinion misuses the meanings of the relevant words and phrases established in the earlier cases. The misunderstanding is underscored by a case (not cited by the Majority) that clarifies that the "in harmony" standard is to be used with reference to the zoning ordinance, and that the zoning ordinance must be in "uniformity" and "accord" with a comprehensive plan: "[Article 66B] requires that special exceptions be made only in harmony with the general purpose and intent of the *Zoning Ordinance* . . . ." *Richmark Realty Co. v. Whittlif,* 226 Md. 273, 285, 173 A.2d 196, 202 (1961) (emphasis added).

The pre–1970 cases apply a statutory standard that existed before the 1970 code revision. Section 7 of the pre–1970 Code noted that a "board of zoning appeals may . . . make special exceptions to the terms of the *ordinance* in harmony with *its* general purpose and in accordance with general or specific rules *therein contained."* Maryland Code (1 957), Article 66B, § 7(a) (emphasis added). The Majority contends that the 1970 legislation did not change this standard and should be treated merely as a non-substantive recodification. The 1970 revision to the Code, however, reflects that the "in harmony" standard was eliminated altogether. What replaced it was a delegation to non-charter jurisdictions to authorize their Boards of Appeals to "[h]ear and decide special exceptions to the terms of an ordinance on which the board is required to pass under the ordinance." Maryland Code, Article 66B, § 4.07(d)(2). The language of the definition of "special exception" added by the 1970 Code amendment informs me that we should not conclude that it was merely a recodification of former § 7. The new definitional section requires "conformity" to the plan. If the General Assembly intended to retain "harmony" as the test it would not have changed the language in § 7 or it would have employed the term "in harmony with" in the new definitional section. The new section must require

---

the exception was based upon a lack of harmony with the zoning ordinance, not lack of conformance with the master plan or comprehensive plan." Majority op. at 549 n. 20, 943 A.2d 1192, 1208 at n. 20.

something different—"conformity" to the "plan," the "guide for the area's future development." Maryland Code, Article 66B, § 1.00(h).

To buttress its claim that "harmony" remained the standard, the Majority opinion cites to post–1970 cases that mention the "harmony" bellwether: principally *Turner v. Hammond*, 270 Md. 41, 310 A.2d 543 (1973); *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981); *Alviani v. Dixon*, 365 Md. 95, 775 A.2d 1234 (2001). The language quoted in these cases is directly traceable to the pre–1970 cases. Moreover, the cases are not concerned with the specific issue raised in the present case. *Alviani* contains block quotations from *Schultz*, but itself focuses on variances. 365 Md. at 112–17, 775 A.2d at 1243–47. *Schultz*, in turn, quotes *Turner* and the pre–1970 cases. In *Schultz* and *Turner*, the Court principally examined the findings of fact necessary to find an adverse effect on neighboring properties, a point unrelated to the necessary relationship standard between a special exception and the "plan" for the area's future development. *Schultz*, 291 Md. at 23, 432 A.2d at 1331; *Turner*, 270 Md. at 60, 310 A.2d at 553.[4] The present case is the first case to come before the Court where we are called upon to consider directly the language change made by the General Assembly in 1970.

## C.

The Majority would have us believe that, regardless of the changes effected by the General Assembly's 1970 legislation, the terms "harmony" and "conformity" are synonymous. In so doing, the Majority ignores this Court's prior decisions that speak *directly* to the meaning of "conform" when used as a plan standard in zoning and planning matters. In *Board of*

---

**4.** *Schultz* concludes, "[t]hese standards dictate that if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied." *Schultz v. Pritts*, 291 Md. 1, 12, 432 A.2d 1319, 1325 (1981). This precept of law is true regardless of whether the Maryland Code dictates an additional required finding of "harmony" or "conformity" with the "plan."

*County Commissioners of Cecil County v. Gaster*, 285 Md.
233, 401 A.2d 666 (1979), we discussed the elevated importance
ceded to the recommendations of the plan by the 1970 changes
to Article 66B. We said,

> the new [§  ] 3.05 is more precise and more demanding than
> its predecessor. It directs that the plan contain certain
> elements ... "This section is designed to assert the full
> force of the plan as being the foundation upon which zoning,
> subdivision, and other land use regulatory devices shall be
> constructed. The various elements of the plan are set out
> clearly, thus providing an understanding of the context of
> the plan. By requiring these various elements to be in-
> terrelated the plan develops the comprehensiveness neces-
> sary to establish land use regulatory devices."

*Gaster*, 285 Md. at 240–41, 401 A.2d at 669–70 (quoting MD.
PLANNING & ZONING LAW STUDY COMM'N, FINAL REPORT 25
(1969)). We held that Article 66B requires enactment of
subdivision regulations that implement the "plan." *Gaster*,
285 Md. at 243, 401 A.2d at 671 (1979). We observed that

> [t]he General Assembly certainly contemplated some change
> from the previously existing scheme of planning and zoning
> when it decreed that in the counties covered by [Article]
> 66B approval of the master plan by the local legislative body
> was required and that subdivision regulations should be
> adopted by such body. How can a county effectively plan
> for capital expenditures for roads, schools, sewers, and
> water facilities if, without regard to preexisting plans, a
> developer, as proposed here, might place a settlement of
> 1,200 or more people in the middle of a previously undevel-
> oped settlement which would overtax school facilities and
> which would necessitate improvement of a road whose re-
> construction had not been contemplated before 1990? Plan-
> ning would be futile in such situations.

*Gaster*, 285 Md. at 248–49, 401 A.2d at 674.

Following *Gaster* is *Coffey v. Maryland–National Capital
Park and Planning Commission*, 293 Md. 24, 441 A.2d 1041
(1982). In *Coffey*, a local ordinance required that proposed

subdivisions must conform to the "plan." 293 Md. at 26, 441 A.2d at 1042. For a unanimous Court, Judge Smith wrote, "when subdivision regulations require that a proposed subdivision comply with the master plan, an application for approval of a preliminary subdivision plan that fails to so comply must be rejected." *Coffey,* 293 Md. at 25, 441 A.2d at 1041.

Relying on the views of the Court in *Coffey* and *Gaster,* the Court of Special Appeals explained the different levels of discretion that the General Assembly granted non-charter jurisdictions in the area of zoning and planning. In *Richmarr Holly Hills, Inc. v. American PCS, L.P.,* 117 Md.App. 607, 634, 701 A.2d 879, 893–94 (1997), the intermediate appellate court was charged with interpretation of the word "harmony." The court noted, "[Appellant] would have this [c]ourt equate 'conformity' with 'harmony.' " *Richmarr Holly Hills, Inc.,* 117 Md.App. at 635, 701 A.2d at 894. In declining to do so, the court noted the treatment of the term "conformance" in *Coffey:*

> [a]pparently treating it as the obverse of "conformance," the Court also employed the word "noncompliance" to describe the state of the proposed subdivision vis a vis the master plan in *Coffey.* 293 Md. at 24, 441 A.2d 1041. Stated elsewhere in the affirmative in the opinion, and apparently as a synonym for "conformance," the Court also referenced "compliance with the master plan." *Id.* at 30, 441 A.2d 1041.

*Richmarr Holly Hills, Inc.,* 117 Md.App. at 649, 701 A.2d at 900.

The intermediate appellate court discussed the language the General Assembly could use to denote more or less stringent requirements:

> [w]ere the legislative body desirous of externally imposing the plan's recommendations as mandates, eschewing virtually all discretion that could otherwise be vested in itself or subordinate agencies, it seems to us that it could have selected, rather than "in harmony with," more directory

language, such as "in conformity with," "consistent with," or "in compliance with."

*Richmarr Holly Hills, Inc.*, 117 Md.App. at 655–56, 701 A.2d at 903.

### D.

The Majority here, ignoring the General Assembly's will and our on-point case law on the issue, sets special exception considerations on a lubricious path. As in *Coffey*,

> [t]he need for [conformity] to the master plan can be illustrated by comparison to the putting of water in a teacup drop by drop. After a period of time there comes the drop which will cause the cup to overflow. By analogy, [allowing some non-conforming special exceptions] will not disrupt the master plan. [More and more of these], however, will disrupt it. The legislative body wished to avoid this when it specified [conformance] with the master plan. [5]

*Coffey*, 293 Md. at 31, 441 A.2d at 1044.

"[T]he Legislature is assumed to have knowledge of and to act in accordance with the decisions of appellate courts." *State v. Conn*, 286 Md. 406, 419, 408 A.2d 700, 706 (1979) (citing *Supervisor of Assessments of Anne Arundel County v. Southgate Harbor*, 279 Md. 586, 591–92, 369 A.2d 1053, 1056 (1977)). The fact that our appellate courts did not mention expressly the 1970 change made by the Legislature in its cases (until now) does not undermine this maxim. "It is not for the court to decide the wisdom, *vel non*, of the zoning code,

---

**5.** The Majority opinion states that "if a special exception had to meet every provision in the master plans, ... they would not be exceptions...." (Majority op. at 574, 943 A.2d 1192, 1221). This statement confuses what a special exception is excepting from in the first place— the requirements of the *zoning ordinance*. *See Mayor & City Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 541, 814 A.2d 469, 485 (2002) ("During the legislative process of defining zones and identifying the permitted uses for each zone, the local legislature also identifies additional uses which may be conditionally compatible in each zone, but which should not be allowed unless specific statutory standards assuring compatibility are met by the applicant at the time separate approval of the use is sought.").

as adopted ..., but rather to enforce it as it is written." *Green,* 77 Md.App. at 152, 549 A.2d at 766 (1988). For these reasons, I am unable to join the Majority opinion. Accordingly, I would reverse the decision of the Court of Special Appeals, remand the case to that court with directions to reverse the judgment of the Circuit Court for Allegany County, and remand the case to the Circuit Court with directions to reverse the approval of the special exception and further remand this case to the Board of Zoning Appeals of Allegany County for application of the proper "conformance" standard to the record evidence in deciding the pending special exception application.[6]

Judges RAKER and BATTAGLIA authorize me to state that they join in this dissent.

---

**6.** Ironically, as the Majority opinion suggests, had the Board applied the "conformity" standard here, a very persuasive argument could be made that there was substantial evidence in the record to support granting the special exception. Majority op. at 526–27 n. 4, 528, 530, 943 A.2d 1194 n.4, 1195, 1196–97. Unfortunately, we review the decision of an administrative agency based solely on the reasons it gives. *Md. Aviation Admin. v. Noland,* 386 Md. 556, 571–72, 873 A.2d 1145, 1154–55 (2005).